Honorable James Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR19-117 JLR |
| | ) | |
| Plaintiff, | ) | DEFENSE MOTION TO DISMISS |
| v. | ) | INDICTMENT AND SUPPORTING |
| | ) | MEMORANDUM |
| SHAWNA REID, | ) | |
| | ) | **Oral argument requested** |
| Defendant. | ) | |
| _____ | ) | Noted:  July 10, 2020 |

**Motion**

Defendant Shawna Reid, by and through her undersigned counsel, moves for an

order dismissing the Indictment.  This motion is based on the due process and equal

protection rights guaranteed under the Fifth and Fourteenth Amendments to the United

States Constitution, the supervisory powers of this court, the files and proceedings herein,

and the adjoined memorandum of law.

**Introduction**

The indictment must be dismissed because of government misconduct during

Shawna Reid's appearance before the grand jury.  First, government attorneys falsely

informed Ms. Reid and the grand jury that her immunity letter and the court's

compulsion order required that she incriminate herself.  Second, at Ms. Reid's grand

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge  Island, WA  98110
(206) 624-3211

jury appearance government attorneys repeatedly posed questions that misrepresented what she had told the FBI when interviewed.

Either instance of misconduct standing alone would warrant dismissal but in combination the misconduct was even more prejudicial.  It was the government, not Ms. Reid, that deceived the grand jury.

## FACTS

### 1.  Background

Ms. Reid has been indicted for making false declarations before the grand jury and obstruction of justice.

The charges arise out of an investigation into the suspected murder-for-hire of former Assistant United States Attorney Thomas Wales in October 2001.  The FBI interviewed Ms. Reid concerning an ex-boyfriend, Chris G[1], who is apparently a suspect in the murder.  The government contends that, in an interview conducted on August 23, 2017, Ms. Reid told investigators that Chris G had admitted to her his involvement in the murder of an "attorney general or judge who lived on a hill" and had shown her the home of the "attorney general or judge", but in a subsequent interview on August 25, 2017, and again before the grand jury, falsely denied providing this

---

[1] "Chris G" refers to "suspect #1" referenced in the indictment and is used herein for clarity.  When this individual is specifically referenced in notes, or grand jury testimony, the redaction "[G]" is used.  Complete, unredacted versions are in the sealed exhibits.

information.

**2. The prosecutor tells Ms. Reid and the grand jury that her immunity agreement requires that she incriminate herself.**

Ms. Reid appeared before the grand jury on February 28, 2018, in response to a subpoena and compulsion order requiring her testimony.  Shortly beforehand, she had obtained an appointed attorney, asserted her Fifth Amendment privilege against self-incrimination, and received a grant of immunity from the government.  In essence, the compulsion order required that she provide truthful testimony but assured that "no testimony or other information compelled under this order or any information derived directly or indirectly from such testimony or other information, may be used against the defendant in any criminal case, except a prosecution for perjury."  Exhibit 1.[2]

Following customary procedure, Ms. Reid was ushered into the grand jury room while her attorney waited outside.  After she was sworn as a witness, she was immediately admonished by the government prosecutor that the grand jury was conducting a criminal investigation, that it was important to tell the truth, that misleading the grand jury or falsely claiming to not recall something or providing any false

---

[2] Copies of the compulsion order, official summary 302 reports from August 23, August 25 and December 7, 2017, the underlying interview notes from the August 23 and August 25 interviews, Snohomish County District Court docket sheet in State of Washington v. [G], and a transcript of Ms. Reid's grand jury testimony on February 28, 2018, are filed separately under seal.  See Exhibits 1-9.  For clarity, the grand jury transcript (Exhibit 8) is referenced herein as GJ followed by the page number.

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

information could result in a charge of perjury or obstruction of justice, and that the

penalty for perjury was a potential five years in jail and/or a $250,000 fine. She was also

told that, unless immunity was granted, anything she said could be used against her in a

future prosecution.

Ms. Reid was then asked if she believed she had been granted immunity. She

shook her head no. After a brief recess to consult privately with her lawyer she returned

to the grand jury and indicated that she believed she had been granted immunity.

Still in the presence of the grand jurors, the prosecutor then reviewed the details

of the compulsion order. He reminded her that she had "refused to testify or provide

other information on the basis of [her] privilege against self-incrimination" and that,

based on the grant of immunity, the court had ordered her to testify about matters which

she had previously refused to provide on the basis of that privilege. GJ 6. The

prosecutor further explained the meaning of the order. He emphasized:

> "*You can no longer invoke your Fifth Amendment privilege against self-incrimination as **you have been compelled under this order to incriminate yourself, to implicate yourself**.*" GJ 7-8 (emphasis supplied)

The prosecutor repeatedly told her that giving a false statement or failing to

comply with the compulsion order could result in criminal charges against her. He then

told her that the government had made no promises to her "about immunity for conduct

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

that you may have committed before today."  GJ 9.

### 3.  Ms. Reid's ambiguous denials of previous statement

During her testimony Ms. Reid emphatically denied that suspect #1 had ever told her about being involved in "the murder of a judge, prosecutor or attorney general that lived on top of a hill" or that he ever drove her by the house where such a murder occurred.  GJ 13.

When asked if she had previously *told* investigators that suspect #1 was involved in a murder, she equivocated, explaining at different points that she might have said so accidentally without meaning to, or from confusion or intimidation from the detectives, and that she had "apparently" said yes in her first interview but "didn't mean it."  GJ 16-20, 38-40.  The government persisted on the subject, asking if suspect #1 ever *bragged* of such a murder:

Q.  In your first interview, did you say to the FBI that [G] bragged to you about his involvement in the murder of a "judge or an attorney that lives on a hill"?

A.  No.

Q.  In your first interview, did you say to the FBI that [G] bragged the murder victim was someone of importance like a judge or an attorney general?

A.   No.  GJ 17.

The colloquy veered into a discussion of later interviews and the background

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge  Island, WA  98110
(206) 624-3211

circumstances of the first interview before returning again to what Ms. Reid recalled of that interview.  She was asked again if she remembered the agent and detective asking her if suspect #1 had ever spoken to her about "being involved in or wrapped up in a murder". She said she recalled the question but did not remember answering "yes".

Q:  Is it your testimony that you did not answer that question yes?

A:  Is it?  No. They told me that I did.

Q.  I am not asking you what they told you. I am asking you what you did when you were asked that question. How did you respond?

A.   Apparently, I said yes.

Q.  Why do you say "apparently"?

A.  Because I don't have any recollection of — of that.  GJ 38-40.

**4.  The false and misleading questioning of Ms. Reid about when she met Chris G**

**A.  The agents' notes and reports regarding when Ms. Reid met Chris G**

Ms. Reid was first questioned on August 23, 2017, at her home and a second time, also at her home, on August 25, 2017.  A third interview occurred on December 7, 2017, at the Seattle federal courthouse.

In the first interview Ms. Reid was questioned by two agents, Seattle Police Detective Thomas Conrad and FBI Special Agent Joshua Anderson, both of whom took

contemporaneous notes.  S/A Anderson's rough notes, totaling two pages, begin by stating "Met Chris [G]  selling magazines 18-19 years old 1999-2000 Dated 3 years, CG to jail 06-08".  Further on, the notes indicate "1st met CG 2001, Embassy suites w/Jim Green".   A few lines later say "between 2001-2003 16-18 years old dated steady" and several lines later say "Actually 2001-2006 dated".   Exhibit 2.

Detective Conrad's notes from the first interview begin "1st met [G]18-19 Met 2000-1999 was very young Dated for three years Left 2006 when he went to jail".  Conrad's notes do not contain any references to Ms. Reid either saying she first met Chris G in 2001 or when she was sixteen or saying that she really dated Chris G between 2001-2006.  Exhibit 3.

The only written report of the first interview is by Detective Conrad.  It states "REID met Chris [G], hereinafter [G], when she was about sixteen years old. REID met and started dating [G] in the year 1999-2000, while selling magazines.  REID remembered being very young at the time she met [G].  REID said she and [G] dated off and on through 2006."  Detective Conrad's written report contains no mention of the rough notes that say "1st met [G] 18 to 19".  The written report also says nothing about Ms. Reid meeting Chris G at the Embassy suites in 2001 and nothing about her saying that she "dated steady" Chris G between 2001- 2003.  Exhibit 4.

As the agents knew at the time of the interview, Ms. Reid was born on May ___, 1985 and did not turn 16 until May___, 2001.  In the period 1999-2000 she was

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge  Island, WA  98110
(206) 624-3211

somewhere between 13 and 15 years old.  Ms. Reid turned 18 on May ___, 2003.  The

agents also knew, as reflected in public court documents, that Chris G had been charged

with domestic violence against Ms. Reid in 2006 and later sentenced to a jail term.

Exhibit 8.

      Detective Conrad and FBI S/A Russell Fox interviewed Ms. Reid two days later,

on August 25, 2017.  The written report of that interview, prepared by Detective Conrad,

states "REID then told investigators that she was mistaken as to what year she had met

[G].  REID was certain that she did not know [G] in 2001.  REID said she began dating

and associating with [G] in 2003, when she was eighteen years old."  Exhibit 5.  The

rough notes of the August 25th interview state "Met Chris at 18 years old not in 2001 Met

Chris winter of 2003 Met G at a hotel she was staying at times Motel 6 was hotel".

Exhibit 6.

      Neither the rough notes nor the written reports attempt to reconcile or clarify the

many conflicting dates and accounts found in the notes.  They do not address the

impossibility of Ms. Reid first meeting CG at age 18 or 19 in 1999-2000 nor attempt to

reconcile or clarify her statement that she stopped dating Chris G in 2006 with her

statement that she and Chris G "dated steady" between 2001-2003.

      The report of the December 7, 2017, interview does not reference the subject of

Ms. Reid meeting Chris G.   Exhibit 7.

### B.  The prosecutors misleadingly question Ms. Reid about when she met Chris G

Both prosecutors extensively questioned Ms. Reid about when she met Chris G. The theme of their questioning was that Ms. Reid told the agents at the first interview that she was 16 when she met Chris Grant, that the agents' contemporaneous notes of the interview unambiguously showed this to be the case, and that Ms. Reid's testimony before the grand jury that she was 18 when she met Chris G was not true and contradicted by the accurate notes of the agents.

Near the start of her questioning, Ms. Reid testified that she was 18 when she met Chris G.  The following exchange then occurred:

Q. And do you recall what year that was?

A.  I worked at the mortgage business so I was — roughly 2003.

Q.  And was it after 2001 [the year of the Wales murder]?

A.  Yes.

Q.  So you're saying it's 2003?

A.  2003.   GJ 11.

Despite this unambiguous testimony, the prosecutor (Mr. Wheatley) soon revisited the issue.  He established that Ms. Reid was interviewed by the FBI on multiple occasions before asking whether, in that first interview, she had said she met Chris Grant in the year 1999-2000.  Ms. Reid said "no".  After asking some questions on other aspects of the interview, the prosecutor then asked,

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge  Island, WA  98110
(206) 624-3211

Q.  . . .  in any interview did you ever tell the FBI that you met [G] in the year

1999-2000?

A.  Not that I recall, and if I did, it was a mistake because I was 16.  I was—that

was 2001, and that's when I worked for Kodiak Mortgage. And I was with a guy named

Darrell.  I didn't meet [G] until two years later, which was 2003, which is when I was 18.

GJ 15-16.

Ms. Reid was also questioned by a second prosecutor (Mr. Clymer) as to when she

met Chris G.  Mr. Clymer took pains to establish the background for the answers Ms.

Reid gave at the first interview.  He made sure that the grand jury knew that the agents

took contemporaneous notes.  "Q.  When one of them asked you questions, did you

notice what the other one was doing? . . . Do you remember him taking notes while you

were talking?"  GJ 34.  And he made sure that Ms. Reid was attempting to be truthful at

the first interview.

Q.  When you talked to them, did you do your best to be honest?

A.  I did.

Q.  Did you have any reason to lie to them?

A.  No.

Having set the stage, Mr. Clymer then asked,

Q.  And when you spoke to them, do you remember telling them in that interview

that you met Chris Grant which [sic] you were 16 years old, not when you were 18?

MICHAEL NANCE
ATTORNEY AT LAW
P.O. BOX 11276
BAINBRIDGE ISLAND, WA  98110
(206) 624-3211

A.  I might have said that, but I was actually 18.

Q.  Okay, but my question is:  Do you remember telling them that you were 16

years old when you met him?

A.  See, like he asked. I said no.  Like, I don't remember saying that I was 16.  GJ

34-35..

Discovery in the case, including the interviewing agents' notes and written

reports, was first made available to Ms. Reid and her lawyer long after her testimony.  In

June 2019 a different grand jury panel returned the present indictment.[3]

## ARGUMENT

## I.

**The prosecutor's false directive to Ms. Reid that her immunity and compulsion order required her self-incrimination forced her to choose between falsely confessing to criminal activity or defying a court order.**

Some procedural errors so compromise the structural protection of the grand

jury that they render the proceedings fundamentally unfair.  *Bank of Nova Scotia v. United*

*States*, 487 U.S. 250 (1988).  The prejudice inquiry focuses on whether the violations

---

[3] In response to a defense request for complete details of the grand jury procedure that produced this indictment, the government declined to elaborate except to acknowledge that a different grand jury (from the one hearing Ms. Reid's testimony) returned the indictment. The defense knowledge of the grand jury proceedings is therefore limited to what is reflected in the transcript of Ms. Reid's testimony before that body and what she recalls about it.  For reasons detailed in the contemporaneously filed Defense Motion to Compel Production of Grand Jury Materials, we seek additional information.

affects the grand jury's decision to indict.  If the violation substantially influences this decision, or if is grave doubt exists that the decision was free from such influence, the violation is not harmless.  *Id.*

Under this precedent, if the government misleads a grand jury, even inadvertently, about a fundamental matter like whether the witness before it has a sworn duty to incriminate herself, the ensuing indictment must be dismissed.  Even an indictment from a successor grand jury, reviewing a transcript of Ms. Reid's testimony, would be irreparably tainted.

Shawna Reid was admonished immediately prior to her testimony in the presence of grand jurors that the grant of immunity required her to "incriminate" and "implicate" herself.  But an innocent person may lawfully invoke her privilege against self-incrimination because "the truthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth." *Ohio v. Reiner*, 532 U.S. 17 (2001) (one of the Fifth Amendment's "basic functions . . . is to protect innocent [wo]men . . . who otherwise might be ensnared by ambiguous circumstances", citing *Grunewald v. United States,* 353 U.S. 391, 421 (1957)).

By clear implication, an innocent person, lawfully invoking her privilege and thereafter testifying under compulsion, cannot properly be commanded to incriminate herself.  Indeed, doing so created an impossible dilemma for Ms. Reid, who believed

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA  98110
(206) 624-3211

12

herself innocent:  if she acknowledged a previous lie because she was expected to do so and believed that her immunity agreement required it, that would be a lie, which would violate her oath; on the other hand, if she denied previous lies she would be obstructing justice for failing to incriminate herself, as she had been told her immunity agreement required.

Meanwhile, the grand jurors, hearing the same admonishment (either first-hand or subsequently by transcript), were primed to hear self-incriminating testimony from Ms. Reid, an impression reinforced from the tenor of the questions directed at her.  When she failed to unequivocally acknowledge the previous lies assumed in the government's questions (or perhaps something unspoken and even more sinister in its murder investigation), this was obstruction and perjury by definition.

Ms. Reid, unschooled in legal matters, was barely aware that she even possessed immunity and unsure why she needed it since she felt innocent of wrongdoing. Compelled to sit before a body of grand jurors without her attorney, she was then lectured at length by the chief authority figure in the room, her interrogating prosecutor, about her legal obligations, which she was required to fulfill on pain of serving up to five years in prison.  According to this authority figure, who was interpreting the compulsion order for her, she was required to "incriminate yourself, to implicate yourself", in this murder investigation.  She could not win, no matter what she said.  Of course, the grand jurors,

MICHAEL NANCE
ATTORNEY AT LAW
P.O. BOX 11276
BAINBRIDGE ISLAND, WA 98110
(206) 624-3211

who had been wrongfully informed that she was guilty of *something*, anticipated her *mea culpa* and, not hearing it, discounted her testimony and likely punished her for defying the compulsion order.

This outcome followed a campaign by the government to paint Ms. Reid as a liar complicit in the murder or its coverup, who had blurted the truth at the initial interview, realized her mistake, and was now desperately back-pedaling from that statement.  Her prosecutors highlighted the unflattering details:  she had previously refused to provide information based on her privilege against self-incrimination; her grant of immunity and a court order now required that she testify about matters she had previously refused to talk about and that she had to "incriminate" herself, "implicate" herself, in this murder investigation while doing so; if she failed to comply (by implicating herself somehow in the crime), she was told she would be criminally charged.  And her immunity agreement did not protect her from certain unspecified acts she "may have committed before today."  In other words, in the prosecutors' thinly-veiled coded language:  Shawna Reid had a role in this murder or its coverup; she has to date been uncooperative with authorities, refused to provide information, and hidden behind the Fifth Amendment; but now a court order requires that she confess her involvement and her failure to do so is a new crime.

Ms. Reid believed herself innocent but was conflicted about how to handle

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

competing directives to both tell the truth and to confess a crime.  This shows in the

tentative, ambiguous nature of her testimony.  Of course, the grand jury was also

unavoidably impacted:  it undoubtedly interpreted Ms. Reid's testimonial performance,

not as the product of conflict and confusion, but as deceitful and evasive.  The grand

jury, too, was operating on the false direction advanced by the prosecutors that Ms. Reid

had to confess her guilt.

The government's erroneous explanation boxed Ms. Reid in and set the stage for

her testimony.  She was told anything short of a confession was, itself, criminal.  But

the explanation subverted justice and due process.  No immunity agreement, no law, no

prosecutorial directive can ever mandate that a person incriminate herself.  Seasoned

prosecutors certainly knew or should have known this, yet they allowed the glaring

untruth — that her immunity agreement required her to incriminate herself in her

testimony — to infect every aspect of the proceeding that followed.

## II

### The prosecutors' misleading questioning of Ms. Reid as to when she met Chris G is devastatingly prejudicial.

The government's misleading questioning made the grand jury believe that Ms.

Reid was a liar.  The prosecutors set up a false dichotomy between the agents' notes,

which supposedly unambiguously showed that Ms. Reid said when first interviewed that

she met Chris G when she was 16, and Ms. Reid's testimony that she met Chris G when

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge  Island, WA  98110
(206) 624-3211

she was 18.  The prosecutors compelled the grand jury to conclude that she told the

agents on August 23, 2017, that she met Chris G when she was 16, that the agents'

contemporaneous notes were reliable and showed this to be true, and that Ms. Reid was

Chris G's girlfriend at the time of Tom Wales' murder.

When the grand jury indicted Ms. Reid it necessarily concluded that she had lied

about what she had said to the agents on August 23.  Ms. Reid's statements at the first

interview were not just relevant to the indictment; they were the sole basis for the

indictment.  Nothing could have more infected the grand jury's ability to assess her

credibility about what she said at the interview about Chris G's purported confession than

questioning that insinuated she was lying about what she said at the same interview on

another topic concerning Chris G.  If she was lying about what she told the agents as to

when she met Chris G the grand jury was almost forced to conclude that she was lying

about what Chris G said to her about the murder.

This false insinuation occurred in the context of a case where Ms. Reid and the

agents were the only witnesses as to what was said.  At no time during the grand jury

questioning do the prosecutors ever tell either Ms. Reid or the grand jury that the rough

notes of the first interview do not include any quote from Ms. Reid that she told the

agents that she was 16 when she met Chris G.  Their questioning omits any mention that

the notes show that Ms. Reid told the agents that she dated Chris G for three years and

left him in 2006, which would have made Ms. Reid eighteen when she met Chris G.  The

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

questions fail to include the information that Ms. Reid, when interviewed two days after the first interview, specifically told the agents that she was certain she met Chris G in 2003 when she was 18.

Nowhere in the questioning do the prosecutors either acknowledge that the agents' notes begin by saying that Ms. Reid "met Chris G selling magazines 18-19" and "1st met Grant 18-19" or explain what exactly meeting Chris G 18-19 might mean.  Nowhere do the questions call attention to the numerous internal inconsistencies in the notes about when Ms. Reid met CG.  All these matters are glossed over in favor of a narrative that has the agents taking accurate contemporaneous notes of Ms. Reid saying only that she was sixteen when she met Chris G.  Had the grand jury learned the true facts it would have assessed Ms. Reid's credibility very differently.

Ironically,  the government asked the grand jury to indict Ms. Reid for lying in her testimony, but it was the prosecutors — not Ms. Reid — who affirmatively misstated the facts (and the law on her legal obligation to incriminate herself) and concealed what the government's own agents' notes showed.  The grand jury indicted Ms. Reid while operating under a fundamental misconception about what she had said earlier and whether the agents' notes reliably refuted her testimony.

A prosecutor has a duty of good faith to the Court, the grand jury and the defendant.  *United States v. Samango*, 607 F.2d. 877, 884 (9th Cir. 1989), citing *United States v. Basurto*, 497 F.2d. 781, 786 (9th Cir. 1974).  Here, the prosecutors breached this

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA  98110
(206) 624-3211

duty in wholesale fashion.

An indictment based in part on testimony which the government knew was perjured cannot stand, *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974), because such an indictment violates the defendant's due process rights.[4]  The use of false evidence as a basis for questioning, particularly by a prosecutor who should know better, is at least as bad.  Even if the prosecutors' questions reflect only carelessness or ineptitude, rather than deliberate misconduct, the grand jury was nonetheless deceived and Ms. Reid deprived of her right to be treated consistent with due process.

Dismissal is in order.

## III.

### The government created a perjury trap.

A perjury trap occurs when the government calls a witness before the grand jury for the primary purpose of obtaining testimony from her in order to prosecute her later for perjury.  *United States v. Chen,* 933 F.2d 793 (9th Cir. 1991).  The perjury trap doctrine has been applied when the government uses its investigatory powers to secure a perjury indictment on matters which are neither material nor germane to a legitimate ongoing

---

[4] ". . . the Due Process clause . . . is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel—and, if the perjury may be material, also the grand jury—in order that appropriate action may be taken." *Basurto* at 785-786.

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

investigation. *Id*. at 796. The government abuses the grand jury process if the purpose of its repetitious questioning is to coax a witness into commission of perjury. *Bursey v. United States*, 466 F.2d 1059, 1080 n. 10 (9th Cir 1972).

On separate occasions — August 25 and December 7 — Ms. Reid denied to authorities that she ever heard Chris G implicate himself in a murder, and she denied having earlier told them that she had heard him do that or said if she had, she had misspoken out of confusion and not intended that language.  The government's decision to later immunize Ms. Reid and then call her as a grand jury witness could perhaps have been properly based on a belief that, once she was placed in the solemn atmosphere of the grand jury room she would testify "truthfully" or to at least the government's version of the truth, i.e., that she had heard Chris G implicate himself in a murder.[5]

But after the government had questioned her at length and elicited repeated sworn denials that she had ever heard suspect #1 implicate himself, there was no practical investigative purpose in then pursuing what she purportedly had told the FBI in their initial meeting.  The government well knew that Ms. Reid had repeatedly disavowed saying or meaning to say that she had heard Chris G implicate himself.  Asking her again, now under oath, about what she had told the FBI in that first meeting could not

---

[5] [F]or many witnesses the grand jury room engenders an atmosphere conducive to truth telling, for it is likely that upon being brought before such a body of neighbors and fellow citizens, and . . . placed under a solemn oath to tell the truth, many witnesses feel obligated to do just that. *United States v. Washington*, 431 U.S. 181, 187-88 (1977).

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge  Island, WA  98110
(206) 624-3211

reasonably have advanced the murder investigation in any meaningful way.

Whether Ms. Reid admitted to previously saying that Chris G had confessed (which would discredit her as a current or future witness for any purpose, since it would directly contradict her other current grand jury testimony) or maintained her denial (which, as a recanted claim of a suspect's admission, would be of no evidentiary value in the murder investigation), that investigation would not be advanced.[6]   At that point in the proceeding, the only conceivable purpose of pursuing the further line of questioning was to create an indictable crime (a perjury) which could then be used as leverage to further manipulate and control her.

The government abused the grand jury process by manufacturing a perjury trap and this conduct further taints the indictment.

## IV.

### Dismissal is necessary to avoid unequal treatment of Ms. Reid by the Department of Justice.

Shawna Reid is not a friend of Donald Trump.  But this is no reason for the Justice Department to treat her case any differently than that of Michael Flynn, who is.  As here, the alleged criminal conduct in Mr. Flynn's case involves what he said in an unrecorded interview with FBI agents.

---

[6] Ms. Reid's dilemma was, of course, exacerbated by the government's confusing explanation on her obligations under the court's compulsion order, as discussed above and as reflected in the ambiguity of her testimony.

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

As has been well publicized, in *United States v. Flynn,* DCDC No. 17-CR-232 EGD, the government has moved to dismiss Flynn's case even after he had twice pleaded guilty and was awaiting sentencing.  Instead of immediately granting this motion, the district court appointed former U.S. District Judge John Gleeson to address the issues surrounding dismissal.

In its response to Judge Gleeson's *amicus* memorandum, the government cited as a reason justifying dismissal the lack of a recorded statement and resulting concerns about the accuracy and completeness of the FBI 302 regarding Flynn's interview and the barriers this raised to proving the case beyond a reasonable doubt.[7]

The discrepancies in the FBI 302 here, which flatly states that Ms. Reid said she was 16 when she met Mr. Grant in direct contradiction to the agents' rough notes that show she said she was 18 or 19 are at least as serious as the problems identified in *Flynn*, which are ones of omitting parts of the interview and not affirmative misrepresentations.  Moreover, here the deleterious impact of the FBI 302  is palpable, not speculative, because it was relied on by the government when questioning Ms. Reid.

---

[7] The government's memorandum explains that in the final FBI 302 there are "two instances where the agents did not record a critical question or answer in their handwritten notes", Mem. at 31, docket #222, and that the problems with the notes in combination with other proof problems "posed another reason to doubt the government's ability to make out its case beyond a reasonable doubt to a jury in the circumstances of this case."

Ms. Reid is entitled to equal treatment under the law. If the problems with an FBI 302 in the absence of a recording support dismissal in *Flynn*, surely they support it here.

### Conclusion

The government's false admonishment, in conjunction with warnings about the penalties for lying, that the court's compulsion order required Ms. Reid "to incriminate yourself, to implicate yourself", forced her to choose between lying and confessing a crime, and irreparably compromised the grand jury charged with considering her testimony and tainted any resulting indictment.

The problem was compounded when the prosecutors painted Ms. Reid as a liar by posing misleading questions about what she had said to the agents concerning when she met Chris G.

The perjury trap further tainted the indictment.

Finally, Ms. Reid is as entitled to fair and equal protection of the law as the high and mighty.

Any one of these defects alone poisons the indictment. Considered together, outright dismissal is the only remedy.

MICHAEL NANCE
ATTORNEY AT LAW
P.O. BOX 11276
BAINBRIDGE ISLAND, WA 98110
(206) 624-3211

Respectfully submitted this 30th day of June, 2020.


/s/ Michael Nance, WSBA #13933

/s/ Robert Gombiner, WSBA #16059

Attorneys for defendant Shawna Reid

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

## Certificate of service

I hereby certify that on the 30th day of June, 2020, I electronically filed the foregoing with the clerk of the court using the CM/ECF system.  Notice of this filing will be sent electronically to counsel for other parties of record.

/s/ Michael Nance

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge  Island, WA  98110
(206) 624-3211