The Honorable James L. Robart

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR19-117 JLR |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| SHAWNA REID, | |
| Defendant. | |

The United States of America, by and through David L. Jaffe, Chief of the Department of Justice Organized Crime and Gang Section, and Matthew K. Hoff, Trial Attorney, respectfully submits this opposition to Defendant Shawna Reid's Motion to Dismiss Indictment. [Docket #52]. This response is based on the attached memorandum of points and authorities, the sealed exhibits filed in support of the Defendant's motions, and the files and records in this case.

Respectfully submitted this 14th day of July, 2020.

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

DAVID L. JAFFE
Chief, Organized Crime and Gang Section
United States Department of Justice


MATTHEW K. HOFF
Trial Attorney
Organized Crime and Gang Section
U.S. Department of Justice
1301 New York Avenue, NW
Suite 700
Washington, D.C. 20005
Tel.: (202) 598-8093

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 2

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Shawna Reid ("the Defendant") moves this Court to dismiss the indictment against her, claiming that "the due process and equal protection rights guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution" demands this outcome and further contending that this Court should exercise its supervisory powers to do so.  Docket #52 at p. 1.  She argues that government misconduct during her grand jury appearance requires dismissal, citing two events: (a) a government's attorney's description of the immunity/compulsion order issued against her; and (b) questioning about the year in which she met the person identified in the indictment as "Suspect #1."  *Id.* at pp. 1-2.  She also argues that the government created a "perjury trap," *id.* at p. 18, and that the outcome in a different federal case requires dismissal of the charges against her.  *Id.* at p. 20.

As explained below, a transcript documenting the Defendant's grand jury appearance reflects that a prosecutor made a single imprecise remark when describing the Defendant's testimonial obligations under the immunity order, but that no government misconduct occurred during her grand jury appearance.  The questioning of the Defendant about the timing of her relationship with Suspect #1 was both proper and sensible in light of her shifting statements on this topic during interviews.   And, in any event, the Defendant has not explained and cannot explain how either the lone challenged statement about the immunity order or the questioning about the timing of her relationship with Suspect #1 prejudiced her or affected the grand jury that later returned an indictment against her for perjury and obstruction of justice.   In fact, neither the prosecutor's explanation of the immunity order nor the challenged questioning caused the Defendant to give false testimony or prompted a later grand jury to indict her.  Further, there was no perjury trap here, merely an effort to provide the Defendant an opportunity to honestly explain her

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 3

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1 inconsistent statements to investigators.  Finally, the outcome in a different case does not
2 require dismissal of the indictment against the Defendant.

3     It would not be a stretch to describe the Defendant's motion to dismiss as frivolous.
4 In any event, it certainly is meritless and should be denied.

5 ## II.    FACTUAL BACKGROUND

6
7 ### A. Defendant Reid's Changing Statements in Interviews About When She Met and Dated Suspect #1 and How Old She Was at the Time

8     On August 23, 2017, Special Agent Joshua Anderson of the Federal Bureau of
9 Investigation ["FBI"] and Detective Thomas Conrad of the Seattle Police Department
10 ["SPD"] interviewed the Defendant.  As reflected in Anderson's contemporaneous notes
11 of that interview, the Defendant told these investigators that she met Suspect #1 "selling
12 magazines" and, apparently described this as having occurred when she was "18-19 years
13 old" in "1999-2000."  Reid Sealed Exhibit 2 at p. 1.[1]  Elsewhere, these notes say "1st met
14 [Suspect #1] 2001," *id.*, and "between 16-18 years old dated steady," with the numbers
15 "2001-2003" written above this passage.  *Id.* at p. 2.  Later, the Anderson notes state
16 "[a]ctually 2001-2006 dated."  *Id.*

17     SPD Detective Conrad's contemporaneous notes of this first interview state: "1st
18 met [Suspect #1] 18 to 19" and "Met 2000-1999 was very young dated for 3 years."  Reid
19 Sealed Exhibit 3 at p. 1.  Both Anderson's and Conrad's notes also document that the
20 Defendant told them that Suspect #1 made statements to her about a homicide.  Reid Sealed
21 Exhibit 2 at pp. 1-2; Exhibit 3 at p. 2.

22     A report by Detective Conrad, drafted on the same day as the August 23, 2017
23 interview, states that the Defendant reported having met Suspect #1 "when she was about

24
25 ---
26 [1] Without explaining why, the Defendant's counsel chose to repeatedly describe Suspect #1 using a first name and last initial. *See, e.g.*, Docket #52 at p. 2 & n.1.  The person identified as "Suspect #1" in the indictment has not been charged with any crime related to the grand jury's investigation.  Thus, the government will not similarly identify Suspect #1 in this publicly-filed pleading.

28
 ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1    16 years old" and started dating him "in the year 1999 or 2000, while selling magazines"

2    and that she "remembered being very young at the time she met [Suspect #1]."   Reid

3    Sealed Exhibit 3 at p. 1.   This report states that the Defendant was born in May 1985, *id.*,

4    which means that she would have turned 16 years old in May 2001.

5        On August 25, 2017, two days later, these same two investigators resumed their

6    interview of the Defendant.  Detective Conrad's notes from the August 25, 2017 meeting

7    state "met [Suspect #1] at 18 years old not in 2001" and "met [Suspect #1] winter of 2003."

8    Reid Sealed Exhibit 6 at p. 1.  A report of this second meeting states that the Defendant

9    "told investigators that she was mistaken as to what year she met [Suspect #1]," that she

10   was "certain" that she did not know him in 2001, and that "she began dating and associating

11   with [him] in 2003, when she was eighteen years old."  Reid Sealed Exhibit 5.  This report

12   also documented that the Defendant denied telling these same investigators two days earlier

13   that Suspect #1 made certain statements to her about a homicide, the very account from the

14   Defendant that both investigators had contemporaneously documented in their notes.  *Id.*

15   at p. 1 ("REID immediately denied that any such conversation had previously taken place

16   with Detective Conrad and SA ["Special Agent"] Joshua Anderson.").

17       On December 7, 2017, the Defendant met with FBI Special Agent Russell Fox and

18   Department of Justice Attorney Joseph Wheatley.  Later that day, Fox documented the

19   meeting in a report.   Reid Sealed Exhibit 7.  This report does not document any additional

20   statements about when the Defendant met Suspect #1 or how old she was at the time.

21   **B. Instructions to Reid About Immunity Order**

22       On February 26, 2018, the Honorable Ricardo S. Martinez of the United States

23   District Court for the Western District of Washington issued an order compelling the

24   Defendant to give testimony and assuring her that "no testimony or other information

25   compelled under this Order or any information directly or indirectly derived from such

26   testimony or other information, may be used against [her] in any criminal case, except a

27

28

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 5

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1  prosecution for perjury, giving a false statement, or otherwise failing to comply with this

2  order."  Reid Sealed Exhibit 1 at p. 2.

3         On February 28, 2018, the Defendant testified before a federal grand jury sitting in

4  the Western District of Washington (Seattle).  The Defendant was represented by Kevin

5  Peck, Esquire, who was present outside the grand jury room.

6         Government counsel explained to the Defendant, who had been sworn, that

7  "because you're testifying under oath, if you're untruthful, if you mislead the grand jury,

8  if you refuse to answer questions before the grand jury after being granted immunity, if

9  you say you don't recall something when you do recall it, if you provide false information

10 in any way, shape, or form, you can be charged with the crime of perjury or obstruction of

11 justice."  Reid Sealed Exhibit 9 at p. 4.  The Defendant confirmed that she understood this.

12 *Id.*  When the prosecutor began to ask the Defendant about the immunity order, he received

13 a non-verbal response and had the witness leave the grand jury room.  *Id.* at pp. 4-5.  When

14 she returned, the Defendant confirmed that she had been granted immunity.  *Id.* at p. 5.

15 The prosecutor then read the immunity order to her verbatim.  *Id.* at pp. 5-7.  The Defendant

16 had a copy of the order in front of her when this occurred.  *Id.* at p. 7.

17        Government counsel then explained the immunity order to Reid:

18        Generally, it means these following three things: You can no longer invoke
          your Fifth Amendment privilege against self-incrimination as you have been
19        compelled under this order to incriminate yourself, to implicate yourself.

20

21        Second, what you say, what information you provide can't be used against
          you in the event you're charged. And that's what you say in this grand jury
22        not what you've previously said or done in the past.  What you say here. All
          right?
23

24        And that there are exceptions to this order. Okay? That if you perjure
          yourself, you give a false statement, or you otherwise fail to comply with the
25        order. So if you lie here, you provide false statements here, you fail to comply
          with the order here, those are exceptions to this order.
26

27 *Id.* at pp. 7-8.

28

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 6

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1    After the Defendant confirmed that she understood this, a different prosecutor

2  elaborated on the last point: "It's not just that you can be liable for false statements. Any

3  testimony you give today could be used against you if you're prosecuted for perjury or

4  making a false statement." *Id.* at p. 8.  The Defendant said that she understood this.  *Id.*

5  The second prosecutor then said: "In other words, you have no protection under that

6  immunity order for making any false statements here today." *Id.*  The Defendant responded

7  "[r]ight," and then, when asked if she understood, again said "[r]ight." *Id.* at p. 9.  The

8  Defendant then acknowledged that her attorney was outside the grand jury room and that

9  she knew that she could "consult with him at any time."  *Id.*

10  **C. Questioning in the Grand Jury About Defendant Reid's Age When She Met
11      Suspect #1 and the Year That This Occurred**

12    During her grand jury testimony, prosecutors asked the Defendant about when she

13  met Suspect #1 and her age when they met, as well as what she had told the investigators

14  about these matters.   These are the relevant passages:

15    Q:   And when did you meet him?

16    A:   I met him when I was roughly 18.

17    Q:   And do you recall what year that was?

18    A:   I worked at the mortgage business so I was -- roughly 2003.

19    Q:   And was it after 2001?

20    A:   Yes.

21    Q:   So you're saying it's 2003?

22    A:   2003.

23  Reid Sealed Exhibit 9 at p. 11.

24    Q:   Now that interview, that first interview with the FBI, did you say that

25       you met [Suspect #1] in the year 1999 to 2000?

26    A:   No.

27

28

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 7

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1    Q:    Now, in that first interview, did you say to the FBI that you dated

2            [Suspect #1] on and off through 2006?

3    A:    No.

4    ********

5    Q:    And with that qualifying statement you've made, in any interview, did

6            you ever tell the FBI that you met [Suspect #1] in the year 1999 to

7            2000?

8    A:    Not that I recall, and if I did, it was a mistake because I was 16.  I was

9            -- that was 2001, and that's when I worked for Kodiak Mortgage. And

10            I was with a guy named Darrell. I didn't meet [Suspect #1] until two

11            years later, which was 2003, which is when I was 18.

12  *Id.* at p. 14-16.

13    Q:    And when you spoke to them, do you remember telling them in that

14            interview that you met [Suspect #1] which [sic] you were 16 years

15            old, not when you were 18 years old?

16    A:    I might have said that, but I was actually 18.

17    Q:    Okay. But my question is: Do you remember telling them that you

18            were 16 years old when you met him?

19    A:    See, like, he asked. I said no. Like, I don't remember saying that I was

20            16.

21  *Id.* at p. 34-35.[2]

22

23

24

25

─────────────────────

26  [2] The Defendant already made the false statements that resulted in her indictment before the

27  questioning appearing on pages 34-35 of the transcript of her grand jury testimony occurred.  The false testimony alleged in the indictment appears at page 17 of the grand jury transcript.

28

1          III.    GOVERNING LAW

2          "Dismissal of an indictment is considered a drastic step and is generally disfavored

3    as a remedy."  *United States v. Fuchs*, 218 F.3d 957, 964 (9th Cir. 2000) (internal

4    quotations and citations omitted).  Courts may dismiss grand jury indictments on either a

5    finding of constitutional or due process error, or under the court's inherent supervisory

6    power to supervise grand juries in the administration of justice.  *See United States v. Isgro*,

7    974 F.2d 1091, 1094 (9th Cir. 1992) (reversing district court's dismissal of indictment

8    based upon both constitutional and supervisory bases).  In advancing a grand jury

9    misconduct claim, however, a defendant must initially overcome the presumption of

10   regularity which attaches as a matter of law to grand jury proceedings.  *See, e.g., United*

11   *States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) ("the law presumes, absent a strong

12   showing to the contrary, that a grand jury acts within the legitimate scope of its authority").

13         Dismissal of a grand jury indictment based on a claimed Fifth Amendment due

14   process violation requires a showing of "outrageous government conduct," that is, conduct

15   "that it is so grossly shocking and so outrageous as to violate the universal sense of justice."

16   *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991) (internal quotation marks and

17   citations omitted).  This defense "is limited to extreme cases in which the government's

18   conduct violates fundamental fairness."  *United States v. Gurolla*, 333 F.3d 944, 950 (9th

19   Cir. 2003).

20         Similarly, a district court's dismissal of an indictment before trial based on the

21   exercise of its supervisorial power "is appropriate only 'if it is established that the violation

22   substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that

23   the decision to indict was free from the substantial influence of such violations."  *Bank of*

24   *Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *United States v. Mechanik*,

25   475 U.S. 66, 77 (1986) (O'Connor, J., concurring)); *see also United States v. Navarro*, 608

26   F.3d 529, 539 (9th Cir. 2010) ("It is clear . . . that if a motion to dismiss is made before the

27   verdict, the district judge should apply the *Bank of Nova Scotia* standard . . . .").

28

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 9

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1       Under either due process or the exercise of a district court's supervisory power, "as
2  a general matter, a district court may not dismiss an indictment for errors in grand jury
3  proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia*, 487 U.S.
4  at 254.  Accordingly, "a district court exceeds its powers in dismissing an indictment for
5  prosecutorial misconduct not prejudicial to the defendant." *Id.* at 255.

6  

## IV.   ARGUMENT

7  ### A. The Prosecutor's Mistaken Description of One Aspect of the Immunity Order
8      Was Neither Misconduct nor Prejudicial and Cannot Be a Basis to Dismiss the
       Indictment.

9       The Defendant argues that "government attorneys falsely informed Ms. Reid and
10 the grand jury that her immunity letter and the court's compulsion order required that she
11 incriminate herself."  Docket #52 at p. 1; *see also id.* at pp. 11-15.  It is true that part of
12 government counsel's advice to the Defendant in the grand jury – that the immunity order
13 compelled her "to incriminate yourself, to implicate yourself" – was less-than-ideally
14 worded.  However, that advice was, at bottom, correct.  On February 26, 2018, Judge
15 Martinez had issued a compulsion order, which required the Defendant to provide truthful
16 testimony to the grand jury, even if that testimony implicated her in a crime.  She could not
17 exercise her Fifth Amendment rights as to any such testimony, but she was immunized, *i.e.*
18 the government could not use her testimony against her in any subsequent prosecution,
19 other than for perjury and related offenses.  Thus, while Judge Martinez's order did not
20 actually *require* the Defendant to implicate herself in a crime (as the defense is now arguing
21 the prosecutor misled the Defendant into believing), it did remove her Fifth Amendment
22 rights that allowed her to avoid implicating herself in a crime if her truthful testimony
23 would otherwise do so.  And, of course, as the prosecutor knew, the Defendant, through
24 counsel, had asserted her privilege, suggesting that she believed that truthful testimony
25 would, in fact, incriminate her.  Read in the context of the prosecutor's entire instructions
26 to the Defendant, it is clear that the prosecutor's statement, although perhaps poorly

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 10

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

worded, merely conveyed that she could not exercise her Fifth Amendment rights even if her truthful testimony would implicate her in a crime.  That message was correct.

In any event, even assuming arguendo that the instruction was wrong, the Defendant fails to explain how this single mistaken description of the immunity order was misconduct or how it could have prejudiced her.  As the grand jury transcript demonstrates, the prosecutor accurately read the immunity order to the Defendant verbatim, and she had a copy of the order in front of her when the prosecutor explained it to her.  Reid Sealed Exhibit 9 at pp. 6-7.  The Defendant was represented by an attorney when this occurred, one to whom she had spoken seconds earlier, presumably about the immunity order, at the suggestion of government counsel, who said to her "[l]et's step outside briefly."  *Id.* at p. 5.  The same prosecutor told the Defendant that she could speak to her attorney again at any time merely by asking to do so.  *Id.* at p. 9.  A prosecutor who is trying to deceive a witness or the grand jury about an immunity order does not read it to the witness and the grand jury, make a copy available to the witness and the grand jury, encourage the witness to discuss it with counsel, and remind her that she can speak to her attorney whenever she wants to.

Further, the Defendant could not have been confused about her obligation to testify truthfully and the consequences for failing to do so, which the order itself described and which two different prosecutors correctly and thoroughly explained to her before she lied to the grand jury.  This is especially true where, as here, the Defendant had legal representation.  There is no reason to believe that the prosecutor's arguable misstep was an intentional or reckless effort to deceive, or that it had any effect on the Defendant's testimony, especially the false denials that resulted in her indictment.

Nor is there any basis to conclude that the description of the immunity order had any effect on the *successor* grand jury that returned the indictment.  As noted above, under the standard set out in *Bank of Nova Scotia,* the Defendant must show that misconduct had a "substantial influence" on the grand jury's indictment decision in order to prevail.  The

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 11

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1  issue before the indicting grand jury was not whether the Defendant had "incriminated" or

2  "implicated" herself in a murder—the crime that was under investigation—but whether she

3  testified falsely before the first grand jury when questioned about having described to

4  investigators statements that Suspect #1 made to her about a homicide.  It simply makes

5  no sense to suggest that the later grand jury's decision to return an indictment for perjury

6  and obstruction of justice is somehow tainted by a single passage in the transcript of the

7  Defendant's earlier grand jury appearance in which the prosecutor was less than fully

8  precise when explaining the immunity order.

9
10  **B. The Questioning of Defendant Reid About the Timing of Her Relationship With Suspect #1 Was Proper and Did Not Unfairly Prejudice the Defendant.**

11       The Defendant also argues that "government attorneys repeatedly posed questions

12  that misrepresented what she had told the FBI when interviewed."   Docket #52 at p. 1-2.

13  There was nothing amiss about the questions posed to the Defendant concerning when she

14  met and started dating Suspect #1, and how old she was at the time.  As the notes and

15  reports of her interviews reflect, she made different statements about this topic at different

16  times.  And, it was clearly documented in contemporaneous notes that the Defendant

17  initially described having met Suspect #1 in 1999 or 2000, and later in that same interview

18  described herself as being 16 years old when this occurred, an age that she turned in May

19  2001.

20       This topic was not inconsequential, both because the possible juxtaposition of the

21  Defendant's relationship with Suspect #1 to the murder (which occurred in 2001) merited

22  inquiry, and because her shifting accounts of the timing of the relationship, as well as her

23  changing versions about other matters, reasonably prompted scrutiny of all of her interview

24  statements.  Thus, it was appropriate for the government to pose questions to the Defendant

25
26
27
28

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

1    about both the timing of the relationship and what she had told investigators about that
2    timing.[3]

3         But, even had the government's questioning about the timing of the relationship
4    with Suspect #1 been improper, this would do the Defendant no good.  She cannot plausibly
5    suggest that the prosecutors' questions on this topic caused her to give the false testimony
6    about a different topic that resulted in her indictment—especially when some of the
7    challenged questioning followed her false grand jury testimony[4]—or that the successor
8    grand jury's decision to indict her was somehow tainted by these questions about the timing
9    of her relationship with Suspect #1.  Thus, she cannot meet her burden of showing
10   prejudice.

11   **C. There Was No "Perjury Trap."**

12        Although the Ninth Circuit has never recognized the "perjury trap" defense as valid,
13   *United States v. McKenna*, 327 F.3d 830, 837 (9th Cir. 2003) ("we have not yet recognized
14   a so-called perjury trap as a valid defense"), it has described the doctrine as it exists in
15   some other circuits:

16        A perjury trap is created when the government calls a witness before the grand jury
17        for the primary purpose of obtaining testimony from him in order to prosecute him
         later for perjury. . .   It involves the government's use of its investigatory powers to
18        secure a perjury indictment on matters which are neither material nor germane to a
19        legitimate ongoing investigation of the grand jury.

---

20
21   [3] The Defendant contends that "[t]he theme of [the prosecutors'] questioning was that she told the
22   agents at the first interview that she was 16 when she met [Suspect #1], that the agents'
     contemporaneous notes of the interview unambiguously showed this to be the case, and that the
23   Defendant's testimony before the grand jury that she was 18 when she met [Suspect #1] was not
     true and contradicted by the accurate notes of the agents."   Docket #52 at p. 9.  The government
24   disputes that there was a "theme" to its questioning in the grand jury and refers the Court to the
     actual questions asked, which appear in the text above.  In any event, even if the questions by
25   government counsel had a "theme," it was the Defendant's answers that were evidence and, more
     to the point, it was her false answers about an entirely different topic—her statements to
26   investigators—that resulted in her indictment.

27   [4] *See* note 2, *supra*.

28
     United States' Opposition to Defendant's Motion to Dismiss Indictment
     *United States v. Reid*, No. CR19-117 JLR – 13

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

*United States v. Chen*, 933 F.2d 793, 796 (9th Cir. 1991); *but see United States v. Burke*, 425 F.3d 400, 408 (7th Cir. 2005) ("We have not embraced this doctrine, however . . . and do not see any reason to adopt it now.").

Even assuming that this doctrine is available to the Defendant, it does not assist her. Here, there is compelling evidence, in the form of contemporaneous notes of an FBI agent and an SPD detective, that the Defendant reported to them that Suspect #1 made statements to her that incriminated him in an unsolved murder. Both the underlying fact—Suspect #1 having made the statement to the Defendant—and the secondary fact—the Defendant having recounted the statement to investigators—are material to the murder investigation. Thus, it was within the province of the grand jury to explore this secondary fact—what the Defendant told the investigators—which could shed light on the circumstances under which the underlying fact—Suspect #1's statement to the Defendant—occurred. In short, the questions that the Defendant answered falsely in the grand jury pertained to "matters . . . material [and] germane to a legitimate ongoing investigation of the grand jury." *Chen*, 933 F.2d at 796. This alone defeats the Defendant's claim of a perjury trap.

It does not matter that when the investigators renewed their interview of the Defendant two days later, she denied having made the statement to them about Suspect #1's admission to her. It was appropriate to issue a subpoena for the Defendant's testimony before the grand jury, to obtain an immunity order to compel her to testify despite an assertion of the Fifth Amendment privilege, and to question her in the grand jury about her crucial statement to investigators, all without regard to her later denial of having made the statement to investigators. It cannot be the case, as the Defendant suggests, that a witness who makes a probative statement to investigators during a murder investigation and then recants it somehow becomes exempt from questioning in a grand jury investigation about her original statement, or somehow can avoid a perjury prosecution if she falsely denies having made the statement. Rather, if that immunized witness falsely denies having made the statement to investigators in the first instance—thereby frustrating

United States' Opposition to Defendant's Motion to Dismiss Indictment
*United States v. Reid*, No. CR19-117 JLR – 14

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594

the grand jury's ability to probe both the secondary fact (what the witness told the investigators), and the underlying fact (what the witness originally claimed had been told to her by Suspect #1)—she is subject to prosecution for perjury or obstruction of justice. Whether or not government counsel subjectively expects or hopes that the recanting witness will revert to her original account when faced with the solemnity of the grand jury proceeding and the oath to tell the truth does not matter. What matters is that the grand jury's investigation into the matter of whether she made the statement in the first instance is legitimate. "When testimony is elicited before a grand jury that is attempting to obtain useful information in furtherance of its investigation, or conducting a legitimate investigation into crimes which had in fact taken place within its jurisdiction, the perjury trap doctrine is, by definition, inapplicable." *Chen*, 933 F.2d at 797 (internal quotation marks and citations omitted). Here, the grand jury had every right to explore what the Defendant said during her initial interview. As a result, there was no perjury trap.

**D. Defendant Reid's Reliance on the *Flynn* Case is Unavailing.**

Finally, the Defendant advances the remarkable claim that the outcome in the prosecution of former National Security Advisor Michael Flynn—in which the government moved to dismiss the false statement charge to which Flynn had pled guilty and was awaiting sentencing—is evidence of discrimination against her and requires dismissal of the indictment in this case. In *Flynn*, however, the government's dismissal motion was based on a subsequent determination that Flynn's statements to the FBI were not "material," as required under 18 U.S.C. § 1001(a)(2), the statute under which Flynn pleaded guilty. *See* Docket #198, D.C. Cir. Case No. 1:17-00232-EGS.

The materiality of the Defendant's false statements to the grand jury is a question of fact for a trial jury to resolve. *See United States v. Gaudin*, 515 U.S. 506, 518 (1995) ("we find nothing like a consistent historical tradition supporting the proposition that the element of materiality in perjury prosecutions is to be decided by the judge"); *United States v. King*, 735 F.3d 1098, 1107 (9th Cir. 2013) ("Because materiality is an element of the

1  offense . . . whether a false statement is material to an agency decision is a question

2  properly resolved by a jury, rather than by the court.").  Accordingly, it cannot be shown

3  pretrial that the Defendant is similarly situated to Flynn and entitled to equal treatment.

4  **V.    CONCLUSION**

5      For the reasons described above, Defendant's motion to dismiss should be denied.

6  Dated this 14th day of July, 2020.

7

8                               Respectfully submitted,

9                               David L. Jaffe

10                              Chief, Organized Crime and Gang Section

11                               *s/Matthew K. Hoff*

12                              MATTHEW K. HOFF

13                              Trial Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States' Opposition to Defendant's Motion to Dismiss Indictment

*United States v. Reid*, No. CR19-117 JLR – 16

ASSISTANT ATTORNEY GENERAL
1301 New York Avenue, NW
Suite 700
WASHINGTON, D.C. 20005
(202)-514-3594