UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>         v.<br><br>SHAWNA REID,<br><br>                              Defendant. | CASE NO. CR19-0117JLR<br><br>ORDER DENYING MOTIONS<br>TO DISMISS THE INDICTMENT |

## I.   INTRODUCTION

Before the court are two motions to dismiss this case brought by Defendant Shawna Reid: a motion to dismiss based on an alleged binding admission of a statutory defense by Plaintiff the United States of America ("the Government") (1st MTD (Dkt. # 133); 1st Reply (Dkt. # 149); and (2) a motion to dismiss based on alleged discovery and *Brady* violations.[1]  (2d MTD (Dkt. # 146); 2d Reply (Dkt. # 150).)  The Government

---

[1] Ms. Reid initially filed a motion to dismiss for discovery and *Brady* violations on July 2, 2021, (Initial MTD (Dkt. # 125)), as well as a supplemental motion for an evidentiary hearing

1  opposes both motions.  (1st Resp. (Dkt. # 145); 2d Resp. (Dkt. # 148).)  The court has

2  considered the parties' submissions, the relevant portions of the record, and the

3  applicable law.  Being fully advised,[2] the court DENIES Ms. Reid's motions to dismiss.

## II.    BACKGROUND

5        Ms. Reid moves to dismiss the indictment against her based on (1) the

6  Government's alleged admission of the statutory defense of recantation and (2) the

7  Government's failure to produce an audio recording of the grand jury testimony during

8  which Ms. Reid allegedly committed perjury.  (1st MTD; 2d MTD.)  The court describes

9  the most relevant facts and portions of the indictment, Ms. Reid's grand jury testimony,

10  the Government's trial brief, and the audio recording at issue below.

## A.    The Indictment

12        On June 20, 2019, a grand jury indicted Ms. Reid for one count of False

13  Declarations Before the Grand Jury in violation of 18 U.S.C. § 1623 and one count of

14  Obstruction of Justice in violation of 18 U.S.C. § 1503.  (*See* Indictment (Dkt. # 3) at

15  1-3.)  Both charges relate to alleged conflicts between Ms. Reid's statements to law

16  enforcement agents and her sworn testimony before a grand jury on February 18, 2018.

17  (*See id.*)

---

to support that motion on July 6, 2021, (Suppl. Mot. (Dkt. # 128)).  The court allowed Ms. Reid to file a revised version of the motion to dismiss after striking the scheduled July 13, 2021, trial date.  (7/7/21 Min. Order (Dkt. # 134); 7/12/21 Min. Entry (Dkt. # 139).)

[2] No party requests oral argument (*see* 1st MTD at 1; 1st Resp. at 1; 2d MTD at 1; 2d Resp. at 1), though Ms. Reid requests an evidentiary hearing regarding her motion to dismiss for alleged discovery and *Brady* violations (2d MTD at 1).  The court concludes that neither oral argument nor an evidentiary hearing would helpful to its disposition of the motions.  *See* Local Rules W.D. Wash. LCrR 12(b)(12).

1    The Government alleges that Ms. Reid told law enforcement agents on August 23,

2    2017, that an individual who the Government refers to as "Suspect #1" "bragged to [Ms.

3    Reid] about Suspect #1's involvement in the murder of a judge or lawyer that lives on top

4    of a hill, and also stated several times that Suspect #1 had called the murder victim an

5    'attorney general.'"[3]  (*Id.* at 2.)  According to the Government, during Ms. Reid's grand

6    jury testimony on February 28, 2018, she falsely denied making these statements to law

7    enforcement officials and instead offered the following testimony:

8        Q.    In your first interview, did you say to the FBI that [Suspect #1]
         bragged to you about [Suspect #1's] involvement in the murder of a, quote,
9        judge or an attorney that lives on top of a hill, end quote?

10       A.    No.

11       Q.    In your first interview, did you say to the FBI that [Suspect #1]
         bragged that the murder victim was someone of importance like a judge or
12       an attorney general?

13       A.    No.

14   (*Id.* at 1-2; Exs. to Defense Mot. (Dkt. # 54 (sealed)), Ex. 9 ("Grand Jury Tr.") at

15   17:16-17:25.)  The alleged contradictions between Ms. Reid's August 23, 2017,

16   statements and her February 18, 2018, grand jury testimony serve as the basis for the

17   Government's false declarations charge.

18       The Government's obstruction of justice charge is based on similar grounds.  The

19   Government alleges that Ms. Reid made false statements in two additional law

20

21       _____
         [3] The court has previously directed the parties to use the name "Suspect #1" to describe

22   the individual at issue in all pleadings and filings.  (8/6/20 Order (Dkt. # 69) at 2 n.1; 7/16/21
     Order (Dkt. # 147).)

1    enforcement interviews after August 23, 2017, and in her grand jury testimony regarding

2    "whether Suspect #1 had told [Ms. Reid] about Suspect #1's involvement in the murder

3    of a lawyer, judge, or attorney general who lived on a hill and whether [she] had reported

4    what Suspect #1 told her when she was interviewed by law enforcement officials on

5    August 23, 2017."  (Indictment at 2-3.)  The additional law enforcement interviews at

6    issue took place on August 25, 2017, and December 7, 2017.  (*See id.*)

7    **B.    Ms. Reid's Grand Jury Testimony and Alleged Recantation**

8           Ms. Reid gave her allegedly perjurious testimony during a grand jury proceeding

9    on February 28, 2018.  (*Id.* at 1.)  After Ms. Reid gave her testimony that forms the basis

10   for the indictment, but still during the same grand jury proceeding, the Government's

11   attorney revisited the topic of her August 23, 2017, statements to law enforcement

12   officers.  First, he asked Ms. Reid about her statements regarding Suspect #1 being

13   involved in a murder:

14          Q.    Do you remember them asking you whether [Suspect #1] had ever
             spoken to you about being involved in or getting wrapped up in a murder?
15

16          A.    Did he tell -- like, did he tell me?

17          Q.    No.  My question is:  Do you remember the detective or the agent who
             came to see you asking you --

18          A.    Yes.

19          Q.    -- about [Suspect #1]?

20          A.    Yeah.

21          Q.    They asked that question?

22          A.    Yeah.

Q.    Just liked they asked all the other questions I just described, correct?

A.    Yeah.

Q.    Do you remember answering that question yes?

A.    No.

Q.    You do not remember answering that question yes?

A.    Right.

Q.    Is it your testimony that you did not answer that question yes?

A.    Is it?  No.  They told me that I did.

Q.    I am not asking you what they told you.  I am asking you what you did when you were asked that question.  How did you respond?

A.    Apparently, I said yes.

Q.    Why do you say "apparently?"

A.    Because I don't have a recollection of -- of that.  Because I was trying to leave the house and go to take my brother to drug court.  And I was super sick and then they were asking me all these questions.  And I accidentally --

Q.    So you were -- you were super sick, you said?

A.    Right.

. . .

Q.    You, by accident, told the agents and the detective on that day that [Suspect #1] had told you about being involved in a murder?

A.    Yes . . . .

. . .

Q.    And when you say you spoke accidentally, do you mean that when you opened your mouth, the wrong words came out?

1

2          A.     I mean I wasn't listening to his question.  I mean -- yeah.  I mean, I
           said something on accident that I wasn't – if I would have known something
3          about a murder, I would have called 911.  I would have said something a long
           time ago. . . .

4    (Grand Jury Tr. at 38:25-42:23.)  The Government's attorney then questioned Ms. Reid

5    about her statements regarding an alleged murder victim living on a hill:

6          Q.     Do you remember telling the agent and the detective that the victim
           of the murder was a judge or lawyer who lives on top of a hill?
7
           A.     No.
8
           Q.     Did you not say that?
9
           A.     I had no idea who the victim was when they came to my house.
10
           Q.     I didn't ask about whether you knew who the victim was.  What I
11         asked you -- I want you to listen to my question.

12         A.     Okay.

13         Q.     Do you remember telling the agent and the detective that the victim
           was a judge or lawyer that lives on the top of a hill?
14
           A.     No.
15
           Q.     Do you remember telling them that [Suspect # 1] told you that the
16         victim was a judge or a lawyer that lives on top of a hill?

17         A.     No.  Can I say what he did tell me --

18         Q.     Sure.

19         A.     -- and this is why this is probably getting all confused?

20         Q.     Sure.

21         A.     He said that he was -- had a friend or was -- had a relative of a judge
           or attorney general.  That's when the detective that was on my house said –
22         kept saying, ["]You're on the money.  You're on the money.["]  And that's

ORDER - 6

1    when, apparently, I said yes, I knew about him saying -- or he was involved
2    in something that I have no idea about.

(*Id.* at 43:1-44:6.)

## C.    The Government's Trial Brief

The Government filed its trial brief on June 29, 2021, laying out the evidence that it will seek to introduce at trial. (Govt. Trial Br. (Dkt. # 112) at 3.) According to the Government, it will demonstrate that Ms. Reid told investigators on August 23, 2017, that Suspect #1 had told her about his involvement in a murder and that he had "bragged to her about his involvement in the murder of a 'judge or attorney that lives on a hill.'" (*Id.*) The Government also states its intent to show that, in the same interview, Ms. Reid told investigators that she remembered Suspect #1 driving her by a house on a hill where the murder occurred. (*Id.* at 4.) The Government declares it will demonstrate that during her grand jury testimony, Ms. Reid denied telling investigators on August 23, 2017, that Suspect #1 had made these statements. (*Id.* at 5.) The Government acknowledges that Ms. Reid "ultimately conceded that she told investigators during her August 23, 2017 interview that Suspect #1 told her he had been involved in a murder of a judge or attorney who lived on a hill." (*Id.* at 6.) It also states that Ms. Reid conceded that on August 23, 2017, she told investigators that Suspect #1 had driven her past a house where the murder occurred. (*Id.*) Finally, the Government states that it will show that Ms. Reid claimed in her grand jury testimony that she was mistaken in telling the investigators that information, and that "Suspect #1 never told her he was involved in the murder nor had he driven her by a house where such a murder occurred." (*Id.*)

1    **D.    The Audio Recording**

2          On October 18, 2019, Ms. Reid's counsel sent the Government a discovery letter

3    requesting "[a]ny written or recorded statements . . . made by Ms. Reid to any person,

4    whether a government investigator/official or not, relating to the Thomas Wales matter,

5    including any statement(s) Ms. Reid made regarding [Suspect #1]." (2d MTD, Ex 1. at

6    1-2.)  On August 23, 2019, the Government provided Ms. Reid with discovery, including

7    a transcript of her grand jury testimony.  (2d. MTD Resp. at 1-2.)  On January 28, 2020,

8    the Government sent a letter to Ms. Reid's counsel stating that it:

9          ha[d] already produced to [defense counsel] a transcript, reports, and notes
          documenting statements that Shawna Reid made to government investigators
10         in this matter.  To the extent that [Ms.] Reid has made relevant statements to
          other persons, and those statements are documented or recorded, the
11         [G]overnment will make timely disclosure to you if required by Rule 16(a)
          of the Federal Rules of Criminal Procedure or the [G]overnment's *Brady*
12         obligations.

13   (2d MTD, Ex. 2 at 4.)  Approximately 18 months later, on June 21, 2021, Ms. Reid's

14   counsel asked the Government to produce a copy of the audio recording of Ms. Reid's

15   grand jury testimony, if any recording existed.  (2d MTD, Ex. 3 at 2.)  The Government

16   then contacted the court reporter from Ms. Reid's grand jury to ask whether any audio

17   recording existed.  (2d Resp. at 2.)  On June 22, 2021, the Government learned that an

18   audio recording of Ms. Reid's grand jury testimony did exist.  (*Id*.)  The Government

19   avers that none of the attorneys present during Ms. Reid's testimony were aware that an

20   audio recording was created before June 22, 2021.  (*Id*.)  It states that the court reporter in

21   question routinely creates audio recordings of all grand jury testimony to use as a back-up

22   to her notes, but the recording is made through software on the court reporter's computer

and it is not obvious to an observer that a recording is being created.  (*Id.* at 2-3.)  On

July 1, 2021, in response to an *ex parte* and sealed application from the Government, the

court ordered the Government to produce a copy of the audio recording to Ms. Reid.

(7/1/21 Order (Dkt. # 120 (sealed)).)  On July 7, 2021, the court struck Ms. Reid's July

13, 2021, trial date and, five days later, set a new trial date of September 16, 2021.

(7/7/21 Order; 7/12/21 Min. Entry.)

### III.    ANALYSIS

The court first addresses Ms. Reid's motion based on the Government's alleged

admission of the statutory defense of recantation before turning to her motion based on

alleged discovery and *Brady* violations.

**A.    First Motion to Dismiss**

Ms. Reid contends that dismissal is appropriate based on the Government's factual

assertions in its trial brief.  (1st MTD at 1.)  Specifically, she argues that the

Government's statements that she "ultimately conceded that she told investigators during

her August 23, 2017 interview that Suspect #1 told her had been involved in a murder of

a judge or attorney who lived on a hill" and that she "conceded that during this interview

she stated Suspect #1 drove her by the house where the murder occurred" constitute

binding admissions of the statutory defense of recantation and thus merit dismissal of the

perjury charges against her.  (*Id*. at 2-3; Govt. Trial Br. at 6.)  The court first lays out the

relevant legal standard before addressing the merits of the parties' arguments.

1.  Legal Standard

18 U.S.C.A. § 1623(d) provides a defense of recantation for a charge of perjury:

1  2  3  4  5  6  7  8  9  10  11  12  13  14  15  16  17  18  19  20  21  22

> Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

18 U.S.C.A. § 1623(d).  Once a defendant has met the burden of production to raise this statutory defense, "the prosecution must prove the inapplicability of this recantation defense beyond a reasonable doubt." *United States v. Tobias*, 863 F.2d 685, 688 (9th Cir. 1988); *see also United States v. Guess*, 629 F.2d 573, 577 n.4 (9th Cir. 1980).  The Ninth Circuit has held that an implicit recantation is insufficient, and a defendant must "unequivocally repudiate [her] prior testimony to satisfy § 1623(d)." *Tobias*, 863 F.2d at 689.  "What recantation requires is 'an outright retraction and repudiation . . . of false testimony.'" *United States v. Wiggan*, 700 F.3d 1204, 1216 (9th Cir. 2012) (quoting *United States v. D'Auria*, 672 F.2d 1085, 1092 (2d Cir. 1982)).  Attempts to clarify, as opposed to actually change one's testimony, are insufficient. *Id.*  In other words, it is not enough that a defendant "merely attempted to explain [her] inconsistent statements." *Tobias*, 863 F.2d at 689.

2.  Analysis

Whether the court considers a factual assertion in a trial brief as "conclusively binding" is entirely discretionary.  *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) ("[S]tatements of fact contained in a [trial] brief *may* be considered

ORDER - 10

1    admissions of the party in the discretion of the district court.") (emphasis in original).[4]

2    The court declines to exercise its discretion to read the Government's trial brief as an

3    admission that Ms. Reid recanted her testimony.

4            Recantation requires "an outright retraction and repudiation . . . of false

5    testimony." *Wiggan*, 700 F.3d at 1216.  The Government's statement that Ms. Reid

6    "conceded" that she had made certain statements does not rise to this level.  (*See* Govt.

7    Trial Br. at 6.)  Instead, the court interprets the Government's language as attempting to

8    briefly describe Ms. Reid's potentially confusing testimony before the grand jury.  Ms.

9    Reid's concessions regarding her statements to law enforcement officers on August 23,

10   2017, were equivocal and unclear.  At multiple points, she appeared confused about

11   whether she was supposed to describe what she believed actually happened or what she

12   told officers in her August 23, 2017, interview.  (*See, e.g.*, Grand Jury Tr. at 38:21-24,

13   38:25-39:10, 43:1-43:15.)  At times, she testified she had been told she made certain

14   statements she had previously denied making or that she did not remember making those

15   statements.  (*E.g.*, *id.* at 39:23 ("A. They told me that I [made that statement]"), 39:18-20

16   ("Q. You do not remember answering that question yes? A. Right"), 43:12-15 ("Q. Do

17

18         [4] Despite acknowledging the discretionary nature of this question in her motion (1st MTD
     at 1), Ms. Reid asserts on reply that the Government's trial brief contains "an admission of a
     party-opponent that must be treated as binding fact by . . . this Court" (1st MTD Reply at 3
19   (citing *United States v. Crawford*, 372 F.3d 1048 (9th Cir. 2013) (no pincite provided)).)  But
     *Crawford* involved a clear and express admission by the defense, both in its briefs and at oral
20   argument, that probable cause existed to arrest the defendant.  372 F.3d at 1055.  This led the
     Court in *Crawford* to conclude that a judicial admission had occurred.  *Id.* (citing *Am. Title Ins.
21   Co.*, 861 F.2d at 227).  Thus, by citing *Crawford* for the proposition that this court "must" treat
     the Government's statement as binding despite the discretionary nature of determining whether a
     statement in a trial brief can be construed as an admission, Ms. Reid puts the cart before the
22   horse.

ORDER - 11

1   you remember telling the agent and the detective that the victim was a judge or a lawyer

2   that lives on the top of a hill? A. No").)  At other times, she testified that she "apparently"

3   made certain statements and that she "accidentally" made them.  (*E.g.*, *id.* at 40:2 ("A.

4   Apparently, I said yes"), 41:2 ("A. That was an accident"), 41:15 ("A. And I said -- like I

5   accidentally said, yeah.").)  Ms. Reid also discussed various reasons for her confusion

6   over what she had said, including being stressed and trying to leave the interview to take

7   her brother to drug court (*id.* at 40:4-8), suffering from mental illness (*id.* at 40:10-12),

8   and being intimidated by the actions of the interviewing officers (*id.* at 41:7-13).

9          Ms. Reid's testimony during this portion of the grand jury proceeding is scattered

10  and, at times, hard to follow.  She could fairly be described as conceding that she had

11  made certain statements to law enforcement on August 23, 2017, that contradict her

12  earlier denials that form the basis for the perjury charges against her.  However, her

13  statements are frequently hedged and contradictory.  This does not rise to the

14  "unequivocal repudiation" of her previous testimony that is required to support a defense

15  of recantation.  *See Tobias*, 863 F.2d at 689.  The Government's framing of her testimony

16  as "concessions" does not change this.  Accordingly, the court does not interpret the

17  Government's statements as an admission that Ms. Reid recanted her allegedly perjurious

18  testimony and DENIES Ms. Reid's motion to dismiss based on the binding admission of

19  a statutory defense.

20         On reply, Ms. Reid suggests that, even without the Government's statements in its

21  trial brief, dismissal is appropriate based on the evidence alone supporting a recantation

22  defense.  (1st MTD Reply at 6.)  For the reasons stated above, Ms. Reid has failed to

1   make a *prima facia* showing that she unequivocally repudiated her testimony or that any

2   alleged repudiation was sufficient to ensure that her allegedly perjurious testimony did

3   "not substantially affected the proceeding."  *See* 18 U.S.C.A. § 1623(d).  Indeed, even

4   accepting for the sake of argument that Ms. Reid had made a sufficient showing to shift

5   the burden to the Government, the court determines based on the evidence before it that

6   the Government has demonstrated beyond a reasonable doubt that no recantation

7   occurred as contemplated by 18 U.S.C.A. § 1623(d).  Thus, to the extent Ms. Reid moves

8   for dismissal based on the defense of recantation regardless of the Government's alleged

9   admission in its trial brief, the court DENIES the motion.

10  **B.      Second MTD**

11          Ms. Reid's second motion to dismiss is predicated on the Government's

12  exceedingly late production of the audio recording of her grand jury testimony.  (2d

13  MTD.)  She contends that the Government's actions violated the Federal Rules of

14  Criminal Procedure and *Brady* requirements, and are sufficiently egregious to merit

15  dismissal of the indictment against her.  (*Id.* at 12.)  The court first lays out the relevant

16  legal standard before addressing the merits of the parties' arguments.

17          1.  Legal Standard

18          A district court may dismiss grand jury indictments on either a finding of

19  constitutional or due process error, or under the court's inherent supervisory power to

20  supervise grand juries in the administration of justice.  *United States v. Kearns*, 5 F.3d

21  1251, 1253 (9th Cir. 1993).  "Dismissal for a due-process violation requires the

22  government's conduct to 'be so grossly shocking and outrageous as to violate the

ORDER - 13

1  universal sense of justice.'" *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020)

2  (quoting *Kearns*, 5 F.3d at 1253).  This defense "is usually raised in situations where law

3  enforcement conduct involves extreme physical or mental brutality or where the crime is

4  manufactured by the government from whole cloth." *Id.* (internal citations and quotation

5  marks omitted).

6        A district court may dismiss an indictment under its inherent supervisory powers

7  for three reasons:  "'(1) to implement a remedy for the violation of a recognized statutory

8  or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests

9  on appropriate considerations validly before a jury; and (3) to deter future illegal

10  conduct.'" *Id.* (quoting *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010)).

11  Dismissal may be appropriate even if the Government's conduct does not rise to the level

12  of a due process violation, but the defendant "must demonstrate prejudice before the

13  court may exercise its supervisory powers to dismiss an indictment." *Struckman*, 611

14  F.3d at 574-75 (9th Cir. 2010) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250,

15  255 (1988)).  Dismissal is a disfavored remedy and [a] court may dismiss an indictment

16  under its supervisory powers "only . . . where no lesser remedy is available." *United*

17  *States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008) (internal quotation marks

18  omitted).

19        2.  <u>Analysis</u>

20        The Government's failure to produce this evidence in a timely manner is in direct

21  violation of the Federal Rules of Criminal Procedure.  Rule 6 charges the Government

22  with retaining control over any recording of grand jury proceedings that is created.  Fed.

R. Crim. P. 6(e)(1).  Rule 16 mandates that the Government provide a defendant with "recorded testimony before a grand jury relating to the charged offense" if a defendant requests it.  Fed. R. Crim. P. 16(a)(1)(B)(iii).  In October of 2019, Ms. Reid's counsel requested that the Government produce "[a]ny written or recorded statements . . . made by Ms. Reid to any person, whether a government investigator/official or not, relating to the Thomas Wales matter, including any statement(s) Ms. Reid made regarding [Suspect #1]." (2d MTD, Ex 1. at 1-2.)  The Government explicitly stated that it would produce any recorded statements of Ms. Reid "if required by Rule 16(a) of the Federal Rules of Criminal Procedure or the [G]overnment's *Brady* obligations." (*Id*., Ex. 2 at 4.) Nevertheless, the Government failed to produce the audio recording until Ms. Reid explicitly asked if it existed less than a month before trial.  The Government does not contest that it failed to abide by the requirements of the Federal Rules of Criminal Procedure. (*See generally* 2d Resp.)

The Government's actions also fall afoul of the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963).  A *Brady* violation requires three elements:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting *Banks v. Dretke,* 540 U.S. 668, 691 (2004)) (internal quotation marks omitted).  The Government contests all three elements.

First, the Government contends that the evidence is not exculpatory.  (2d Resp. at 8.)  Evidence is exculpatory under *Brady* if it "would tend to call the government's case

1    into doubt." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013).  The Government argues

2    the audio recording cannot be exculpatory because it contains, in part, Ms. Reid's

3    allegedly perjurious statements and thus supports the charges against her.  (2d Resp. at 8.)

4    But this argument assumes that the Government's interpretation of the evidence is the

5    only valid viewpoint.  Ms. Reid contends that the audio is directly relevant to whether she

6    knowingly made perjurious statements or was confused, intimidated, agitated, or

7    otherwise not fully aware of the meaning of her testimony when she gave it.  (*See* Def.

8    Trial Br. (Dkt. # 132) at 4 (arguing Government will fail to demonstrate that Ms. Reid

9    both understood question and deliberately made false answer during her testimony); 2d

10    MTD at 6 (raising similar arguments); Mot. for Subpoena (Dkt. # 77) at 3 (same).)  The

11    Government concedes that "[t]he resolution of this dispute and determination of what the

12    audio recording proves is a matter properly submitted to [the jury]."  (2d MTD at 8.)  But

13    the Government does not explain how the jury would hear this evidence if Ms. Reid and

14    her counsel did not have the opportunity to review and incorporate it into their trial

15    strategy.  (*See generally id.*)  The evidence withheld by the Government sufficiently

16    supports Ms. Reid's defense such that it is exculpatory.

17        Second, the Government argues that the evidence was not suppressed because it

18    "was not aware of its existence until June 22, 2021," and it immediately took steps to

19    obtain and disclose the evidence to Ms. Reid once it learned of its existence.  (2d Resp. at

20    8.)  But suppression can be inadvertent, and the Government cites no case law in support

21    of its argument that ignorance of the recording's existence is a defense against a *Brady*

22    violation.  (*See* 2d Resp. at 8); *Amado*, 758 F.3d at 1134 ("[E]vidence must have been

1  suppressed by the State, either willfully or inadvertently.").  Accordingly, the court finds

2  that this prong of the *Brady* analysis is satisfied.

3          Finally, the Government contends that the failure to produce the audio recording

4  in a timely fashion did not prejudice Ms. Reid.  Specifically, it argues that there can be no

5  *Brady* violation because the failure to disclose does not matter so long as disclosure is

6  "made at a time when [it] would be of value to the accused."  (2d Resp. at 7 (citing

7  *United States v. Gordon,* 844 F.2d 1397, 1403 (9th Cir. 1988).)  But the Government's

8  suggestion that a recording of her testimony would not have been useful for Ms. Reid's

9  defense is belied by its own previous arguments in this case.  Ms. Reid made clear that

10 her defense rested, in part, on an argument that she did not knowingly commit perjury,

11 and that she believed witnesses that had been present for her testimony would support

12 this argument more than the transcript alone.  To this end, she sought the testimony of

13 Government attorneys who were present at her grand jury proceeding.  (Mot. for

14 Subpoena.)  In opposing this motion, the Government argued that Ms. Reid had failed to

15 exhaust other sources for the sought-after testimony.  (Resp. to Mot. for Subpoena (Dkt.

16 # 80) at 11-12.)  Ms. Reid could, in the Government's eyes, "call the Grand Jury

17 stenographer or any member of the Grand Jury, either of whom could capture the full

18 circumstance of the grand jury atmosphere in which [Ms. Reid] testified."  (*Id.* at 12

19 (citation and internal quotation marks omitted).)  The Government cannot credibly argue

20 that Ms. Reid had not exhausted alternative avenues of pursuing her defense and then,

21 when it is revealed seven months later that Government had neglected its charge to

22 maintain and produce an audio recording directly relevant to her defense, contend that

ORDER - 17

1   earlier production of the evidence would not have been valuable.  The evidence in

2   question would have been valuable to Ms. Reid had it been produced more than three

3   weeks before the scheduled trial date, and the failure to do so prejudiced Ms. Reid.

4          The court concludes that the Government failed to comply with the Federal Rules

5   of Criminal Procedure and *Brady* requirements by delaying production of exculpatory

6   evidence until the eve of trial.  This leaves the question of what remedy is proper.  Ms.

7   Reid maintains that dismissal of the indictment under the court's inherent supervisory

8   power is the only way to address the Government's error.  (2d MTD at 1.)  Dismissal,

9   however, is only appropriate when, "in [the court's] judgment, 'the defendant suffers

10  substantial prejudice and where no lesser remedial action is available.'"  *Bundy*, 968 F.3d

11  at 1023 (quoting *Chapman*, 524 F.3d at 1087); *see also Kearns*, 5 F.3d at 1254 ("[O]ur

12  precedents make clear that dismissal of an indictment is an appropriate sanction for a

13  [*Brady*] violation only where less drastic alternatives are not available.")  The court

14  concludes that lesser remedial action, namely the continuance of the trial that the court

15  has already granted, is sufficient remedy for the Government's errors.

16         Ms. Reid cites *Bundy* as a recent example of a proper dismissal for discovery and

17  *Brady* violations.  (2d MTD at 5.)  In *Bundy*, the Government failed to produce

18  exculpatory evidence that had been requested by the defendants.  968 F.3d at 1026.  The

19  Government's errors, however, were not discovered until trial was underway, and the

20  district court held several evidentiary hearings before eventually declaring a mistrial.  *Id.*

21  at 1026-29.  The district court then concluded that the *Brady* violations were egregious

22  and prejudicial enough to warrant dismissal of the indictment with prejudice.  *Id.* at

1    1029-30.  The district court found dismissal to be the appropriate remedy "because the

2    government withheld key evidence favorable to the defense until after trial was underway

3    . . . and dismissing without prejudice would allow the government to cure its mistakes, to

4    the detriment of the defendants."  *Id.* at 1031.  In upholding dismissal, the Ninth Circuit

5    specifically highlighted the possibility of the government gaining an advantage from

6    already having tried the case and its ability to identify weaknesses and attempting to

7    correct them in a second prosecution.  *Id.* at 1043, 1045.[5]

8         But these concerns, and the appropriateness of dismissal with prejudice as a

9    remedy to address them, stem from the fact that trial had already commenced when the

10   discovery and *Brady* violations were uncovered.  That is not the case here.  Ms. Reid has

11   received the evidence before trial, and the court has already postponed the trial until

12   September 16, 2021.  (7/12/2021 Min. Entry.)  By the time trial commences, Ms. Reid

13   and her counsel will have had the audio tape for over two months—this is enough time to

14   incorporate the evidence into her trial strategy.[6]  Nor will the Government gain any

15

16   ───────────────
     [5] The Ninth Circuit also discussed the Government's "failure to acknowledge and confess
     any wrongdoing during the course of this case" and the need to impose a sanction that would
17   "deter future prosecutions from engaging in the same misconduct as occurred here."  *Bundy,* 968
     F.3d at 1044-45.  Here, while the Government erred, it also immediately notified the court of the
18   existence of the audio recording once it discovered it.  (*See* 2d Resp. at 2 (describing *ex parte*
     sealed motion filed on June 22, 2021).)

19   [6] Ms. Reid argues that she will be prejudiced by this delay.  (2d MTD at 11.)  However,
     just a few weeks before the court postponed the trial, Ms. Reid's counsel argued in favor of a
20   delay, stating that, because "Ms. Reid is out of custody and in current compliance with her bond
     conditions . . . no urgency exists that justifies holding a trial [while certain COVID-19 related
21   restrictions are in place]."  (*See* 6/22/21 Mot. (Dkt. # 104) at 8-9.)  The court sees no reason why,
     given this apparent lack of urgency, the addition of more evidence that Ms. Reid views as helpful
22   for her defense should mean that the delay she sought in June would prejudice her in July and
     August.

ORDER - 19

1  advantage from delay as, unlike in *Bundy*, it has not presented any of its case against Ms.

2  Reid to a jury.  *See* 968 F.3d at 1043, 1045.  Thus, to the extent that Ms. Reid will be

3  prejudiced by the delay in producing this evidence, the court finds that the postponement

4  of the trial is sufficient to remedy this prejudice.

5       Ms. Reid also contends that she has suffered prejudice because the court denied

6  her previous motion to dismiss based on the Government's improper explanation of the

7  compulsion order during Ms. Reid's grand jury testimony.  (2d MTD at 9-10.)  She

8  argues that the court, by relying on the transcript rather than the audio, failed to consider

9  the best evidence when it ruled on this motion and that the court should revisit the issues

10  raised in her motion.  (*Id.* (citing 8/6/20 Order (Dkt. # 69) at 10).)  But the court has

11  reviewed the audio recording of Ms. Reid's grand jury testimony.  It concludes that

12  nothing in the audio recording changes its finding that dismissal was not warranted by the

13  Government's errors in explaining the compulsion order.[7]  Accordingly, the court finds

14  that Ms. Reid was not substantially prejudiced by only having the transcript, rather than

15  transcript and the audio recording, when she filed her motion to dismiss based on the

16  Government's improper explanation of the compulsion order.  For similar reasons, the

17

18

19

20

21

22

---

[7] The court similarly rejects Ms. Reid's argument that dismissal is warranted by the fact that the grand jury that indicted Ms. Reid in the current case only had access to the transcript rather than the audio recording.  (*See* 2d MTD at 10.)  The Government would not have been obligated to play the audio recording for the grand jury even if it had known it existed.  (*See generally* 2d MTD); *United States v. Isgro*, 974 F.2d 1091, 1096 (9th Cir. 1992) ("[P]rosecutors simply have no duty to present exculpatory evidence to grand juries.").  Ms. Reid cites no authority otherwise.

1   court declines Ms. Reid's invitation to revisit this issue as a separate motion to dismiss.

2   (*See* 2d MTD at 10.)

3          It bears reemphasizing that the Government's discovery errors are serious and

4   violate both the Federal Rules of Criminal Procedure and the requirements of *Brady*.

5   More fundamentally, they show a lack mindfulness of the unique role that the prosecution

6   plays in the criminal justice system, with a primary interest "not that it shall win a case,

7   but that justice shall be done." *Amado*, 758 F.3d at 1134 (quoting *Berger v. United*

8   *States*, 295 U.S. 78, 88 (1935)).   In this instance, however, a trial continuance is

9   sufficient to cure the prejudice caused by these errors.   Thus, because the court has

10  already granted a continuance and postponed the trial by over two months, the court

11  DENIES Ms. Reid's motion to dismiss the indictment for discovery and *Brady* violations.

## IV.    CONCLUSION

13         For the foregoing reasons, the court DENIES Ms. Reid's motion to dismiss based

14  on binding admissions of a statutory defense (Dkt. # 133) and motion to dismiss for

15  discovery and *Brady* violations (Dkt. # 146).

16         Dated this 11th day of August, 2021.


                                        JAMES L. ROBART
                                        United States District Judge

ORDER - 21